# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 19, 2016

## STATE OF TENNESSEE v. THOMAS L. DOWLEN

**Appeal from the Circuit Court for Robertson County**
**No. 74CC3-2012-CR-58   John H. Gasaway, III, Judge**

_____

**No. M2015-01582-CCA-R3-CD – Filed November 7, 2016**

_____

A jury convicted the defendant, Thomas L. Dowlen, of first degree (premeditated) murder.  On appeal, the defendant asserts that the evidence is insufficient to support the verdict of guilt and that he is entitled to a new trial based on the prosecutor's remarks during opening argument.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

H. Garth Click, Springfield, Tennessee, for the appellant, Thomas Lamont Dowlen.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John W. Carney, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The defendant shot the victim, Candice Owens,[1] in the course of a feud with the victim and her brother, David Owens.  The defendant was charged with both the first degree (premeditated) murder of the victim and with the reckless endangerment of Christopher Williams, the victim's boyfriend.

---

[1] The victim's name is spelled inconsistently in the record.  We adopt the spelling used in the indictment.

Prior to trial, the defense filed a motion in limine to prohibit the medical examiner from referring to the manner of death as homicide. The trial court ruled that the medical examiner could give an opinion on manner of death but that the court "would never allow the State to refer to it as murder." During opening statement, the prosecution, in outlining the anticipated proof, used the word "murder." The prosecutor stated:

> [Witnesses] will tell you how this murder happened – excuse me, homicide. I shouldn't say murder. That is a mistake, that's my fault. How this homicide happened. It is yours to decide whether it is first degree or second degree. It's a homicide right now. We know that because the autopsy says that.

No objection was lodged, and no further instructions were given.

The proof at trial included a stipulation that the defendant had been in a long-term relationship with Lindsey Hankins, and the two had a child together in 2009. Ms. Hankins left the defendant in the weeks prior to the homicide, and she began a romantic relationship with Mr. Owens, the victim's brother. The victim, Mr. Owens, and the defendant exchanged text and voice messages regarding Ms. Hankins prior to the shooting. The messages were not introduced into evidence, but the stipulation established that the three were "squabbling" via text and voice message.

At the time of the shooting, the victim was in a romantic relationship with Mr. Williams. The two were habitual users of crack cocaine. Mr. Williams and the victim would sometimes stay at a motel, but they also occasionally stayed at Kenny Link's residence, which was the site of the shooting. Mr. Link was deceased at the time of trial, but Mr. Williams testified that he and the victim would either pay Mr. Link or provide him with drugs in exchange for a place to stay. Mr. Link's home was located on Twelfth Avenue, and there was a path from the back of Mr. Link's house to a nearby market. Across the street from the residence was a vacant lot with some gravel in it, and beyond the lot was the home of Mr. Randall Holland.

There was evidence introduced at trial that the defendant had recently been to Mr. Link's home and was aware that Ms. Hankins frequented the home. Talisha Harrison testified that she was living at Mr. Link's around the time of the shooting and that the defendant had stopped by Mr. Link's home the morning of the homicide around 10:00 a.m. The defendant, who testified in his own defense, stated that three days prior to the shooting, he had stopped by the home of Mr. Link looking for Ms. Hankins. The defendant had heard that Ms. Hankins was selling medication prescribed for the

2

defendant which the defendant used to treat pain for a prior gunshot wound to the leg.  He did not find Ms. Hankins at Mr. Link's home on that date.

On June 30, 2011, the day of the shooting, Mr. Williams and the victim were awoken when the victim's brother, Mr. Owens, came to the motel room they had rented.  After a discussion, Mr. Williams and the victim decided to use their remaining money not to pay for another night at the motel but to purchase crack cocaine and spend time with Mr. Owens.  The three ate lunch and went to Mr. Link's home at around 10:00 or 10:30 a.m.  All four consumed crack cocaine at Mr. Link's residence.  Mr. Williams testified that there might have been other people who dropped by Mr. Link's house during the day, but he did not recall them.  Mr. Williams testified that in the afternoon at around 2:50 p.m., Mr. Owens left to go to the market to get beer and cigarettes for himself.

James Pennington spent June 30, 2011, with the defendant.  Mr. Pennington called the defendant sometime after 9:00 a.m. and offered to pay for the defendant to get a haircut and to buy the defendant gas if the defendant would give him a ride to the house of his cousin, the barber.  The defendant came to pick Mr. Pennington up in the defendant's mother's vehicle about thirty minutes later.  Mr. Pennington called his cousin, but his cousin was not at home.  The defendant and Mr. Pennington then went to the house of another of Mr. Pennington's cousins, where they smoked some marijuana.

At some time in the afternoon, the defendant's mother called and asked the defendant to bring her some beer.  Mr. Pennington offered to pay, and the defendant drove them to the store.  Mr. Pennington testified that as he was going into the store, a white man came out and kept the door open for him.  Mr. Pennington learned later that this man was Mr. Owens.  As Mr. Owens left the store, he and the defendant immediately began to argue.  Mr. Owens approached the defendant, who put out his hands to distance himself.  Mr. Owens, who had a "built up" physique, then punched the defendant.  The defendant grabbed Mr. Owens and Mr. Pennington separated them.  Mr. Owens then took off running down a path behind the market.  Mr. Pennington testified that the defendant also saw where Mr. Owens was headed.  The defendant's face was swollen where he had been punched, and he kept saying, "[L]ook at my face."  The defendant drove off quickly and turned up Twelfth Avenue.  The defendant then saw Mr. Williams and the victim on the porch of a house and hit the brakes, putting the car into park before it came to rest partially in the gravel lot and partially in the street.

The defendant reached under the seat and took out a gun, which he put into his pocket.  Mr. Pennington stated he had not previously known about the gun.  The defendant walked up to the porch and pulled out the gun.  He then shot the victim.  Mr. Pennington testified that the defendant shot the victim twice in the legs.  The victim fell, making a motion to indicate "don't shoot me [any] more."  The defendant, after a pause

3

of "a couple" of seconds, then fired several more shots as he stood over the victim. According to Mr. Pennington, Mr. Williams was off to the defendant's side when he started shooting, and he was not near the direction the gun was pointed. On cross-examination, Mr. Pennington recalled from his prior testimony that Mr. Williams had retreated into the house while the defendant was shooting. Mr. Pennington did not hear the victim or defendant say anything. On cross-examination, he acknowledged having told police that the defendant asked where Mr. Owens was and the victim responded, but he testified he no longer recalled the exchange. The defendant, who had a previous gunshot wound to the leg, could not run, but he moved as quickly as he could back to the car. Mr. Pennington asked him what he had just done, and the defendant gave him a "dead" stare and appeared "daze[d]." The defendant drove off quickly, and Mr. Pennington jumped from the car when the defendant slowed to make a turn. Mr. Pennington testified that he eventually gave a statement to police. He acknowledged that his statement to police did not indicate that the defendant shot, paused, and then fired more shots.

Mr. Williams testified that he, the victim, and Mr. Link were all in the living room of the home prior to the shooting. Because the front window was boarded up, they could not see outside without opening the door. Mr. Williams testified that around 3:15 p.m., he heard a car hit the gravel in the lot across the street, "like an accident just occurred," and he and the victim stood in the doorway to see what had happened. He saw the defendant driving the defendant's mother's car, which was a two-tone Chevy, and he saw James Pennington in the passenger's seat. The defendant looked angry, and his jaw was swollen. The car was facing the house.

Mr. Williams testified that the defendant got out of the car and asked where Mr. Owens and Ms. Hankins were. The victim gave a "smart" response, asking "[W]hat do you want[?]" The defendant then said, "Get under the wheel, Bro," to Mr. Pennington. The defendant reached across to his left pocket with his right hand and pulled out a .357 or .38 caliber silver-barreled gun. Mr. Williams testified that the defendant, who was on the top step, then shot the victim, first in the left and then in the right leg, and the victim fell. When the victim fell, she did not at first fall forward or backward but her legs came out from underneath her. The defendant then shot the victim three more times. Mr. Williams testified that the defendant walked with a quickened pace back to the car and got in the passenger's side. Mr. Williams acknowledged that he was focused on the victim at the time. Mr. Williams "ran around in circles trying to get somebody to call 911." According to Mr. Williams, no one threatened the defendant, and no one had any weapons except the defendant. Mr. Link, who remained in the home, was also not armed, and the back door to Mr. Link's home was secured by several knives jammed in between the frame and door. Mr. Williams acknowledged that he was currently in jail for violating his probation but stated that he was not gaining anything from his testimony.

4

Talisha Harrison, who was on probation for an unrelated aggravated burglary, also testified that she witnessed the shooting. According to Ms. Harrison, the defendant came to the house in the morning and stayed about five minutes. Sometime after 11:00 a.m., Mr. Williams and the victim arrived. The people present in the house all used drugs. Ms. Harrison did not recall seeing Mr. Owens prior to the shooting. Ms. Harrison testified that she went to the market near the house to get a beer for the victim, brought it to the victim, and began to walk across the empty lot to Mr. Holland's house. While she was passing through the vacant lot, a car pulled up ten feet from her, with the driver's side facing Mr. Link's home. She identified a photograph of the car belonging to the defendant's mother as the car which pulled up next to her. Ms. Harrison then heard the victim shout, "Thomas, what are you doing back?" Ms. Harrison testified that the victim was the only person on the porch. When the defendant was in front of the steps leading to the porch, he shot the victim in the left leg. The victim fell backward and screamed. The defendant moved forward to the top of the steps and after a pause of a few seconds, he began to shoot again, shooting the victim, who was lying on the porch, five times. The defendant turned around and moved quickly to the car. The defendant had an "empty" stare as if "no one was there." Ms. Harrison observed that his cheek was injured. After the shooting, Ms. Harrison saw Mr. Owens outside, around the side of the house, shouting "to tell Cand[i]ce he was okay." Ms. Harrison testified that she believed the defendant got in the driver's seat and that she saw another person in the car. At the time, she did not know the other person, but during the course of the trial she recognized him and discovered it was Mr. Pennington. The car "spun off." Ms. Harrison ran to her mother's house. She did not observe anyone other than the defendant with a gun.

Randall Holland testified that he lived one street over from Mr. Link, on the other side of the vacant lot. Mr. Holland had a privacy fence through which he could not see Mr. Link's home. When Mr. Holland returned from work in the afternoon, his father, the victim's mother, and another man were in his back yard. Prior to the shooting, Mr. Holland saw Mr. Owens come into Mr. Holland's back yard. Mr. Owens had been running, was "sweaty," and was out of breath. Mr. Owens left after three or four minutes. Mr. Holland was getting a drink of water when he heard five shots. He heard one shot first and then four back-to-back. Mr. Holland checked on his father and saw the victim's mother run up to Mr. Link's porch. He could see that the victim was lying on the porch bleeding. The victim's mother came back, and Mr. Holland gave her a towel and called 911. He did not see anyone else on the porch but saw a heavy-set African-American man run out the back door of Mr. Link's home and saw the police put the man in a patrol car.

James Bush was working nearby, thirty-five feet in the air in the bucket of a truck, fixing an electrical light for the city. He heard three "pops" close together and saw an

African-American man holding something in his hand run away from a house and get into a two-toned car. He saw the victim lying down in the porch but did not see anyone else on the porch. Mr. Bush took a photograph of the vehicle, which moved off quickly.

The defendant, testifying on his own behalf, generally confirmed Mr. Pennington's account of the morning. He testified that Mr. Pennington called him around 10:00 a.m. and that they had attempted to get a haircut and spent some time at Mr. Pennington's cousin's home, where the defendant smoked some synthetic marijuana and the others smoked marijuana. The defendant's mother then called and asked him to get her beer. Mr. Pennington offered to pay for the beer, and so the defendant went to the market of Mr. Pennington's choice.

The defendant testified that as soon as he pulled in, Mr. Owens came out the door and began to argue with him. The defendant's window was down, and Mr. Pennington was still in the car. The defendant confirmed that Mr. Owens attempted to get close to him and he put his hand out to stop him. The defendant glanced at Mr. Pennington, and Mr. Owens took the opportunity to punch him. The defendant grabbed Mr. Owens and Mr. Pennington separated them. The defendant stated that an egg-shaped knot was immediately visible on his face in his reflection on the storefront. Mr. Owens began to come back, but Mr. Pennington "stepped up," and Mr. Owens then ran away. The defendant testified that he was angry, out of his mind, and enraged, and he stated that he drove off the sidewalk as he left the store. He confirmed that he kept telling Mr. Pennington to look at his face. The defendant testified that he was not planning to go to Mr. Link's house but that he saw the victim and Mr. Williams on the porch and that he then made a sliding stop in the gravel lot. He testified that he believed Mr. Owens would be in the house.

According to the defendant, Mr. Pennington handed him a .357 caliber chrome gun before he got out of the car. He put the gun in his pocket. As he walked toward the porch, the victim said, "Thomas, what the f**k are you coming up here for?" He also stated that he simultaneously asked where Mr. Owens was. He testified that when he got to the steps as the victim made her statement, he saw "a person's shoe start to run across inside the house." The defendant stated he did not see who it was, but he could tell it was a white man and believed it was Mr. Owens. He acknowledged that Mr. Link was also white and it could have been him. The defendant stated that he was shooting at the person inside the house and that he heard someone scream as he was shooting. The defendant testified that he did not realize he had shot the victim and that he did not recall much after the first shot. He acknowledged that he knew that the victim was standing in front of the door that he was shooting at. He also acknowledged that he did not see anyone at the house with a weapon, but he speculated that someone could have had a weapon.

6

The defendant stated that he drove off after the shooting. Mr. Pennington took the gun from him and jumped out of the car with the gun. The defendant acknowledged that he did not seek medical treatment for his wounds, noting that he was "on the run" and afraid to go to a hospital. The defendant testified that he regretted shooting the victim. He also testified that he left because he was scared.

Officer Charles Haynes was dispatched to the scene at 3:30 p.m. and saw the victim's mother, who was deceased at the time of trial, holding the victim and crying. An ambulance arrived, and the victim was determined to have died at the scene. Mr. Link, Mr. Williams, and a man named Billy Harrison were interviewed at the scene.

Detective Rickie Morris testified that he investigated the crime. He found the two-toned maroon Caprice parked by an abandoned house and received the defendant's mother's permission to search it. The search turned up an antique gun which was not involved in the crime and did not appear to function. The defendant testified that the gun in the back of the car was one he had found at a house when he moved. Law enforcement searched extensively for the defendant, and he was eventually put on the Tennessee Bureau of Investigation's most wanted list. He was apprehended in Georgia in September 2011, a few months after the homicide.

Dr. Sandra Thomas testified that the victim suffered six gunshot wounds. A wound to the victim's back which pierced the aorta and pulmonary artery would have been fatal even with immediate medical attention and would have caused death within minutes. The victim also suffered another gunshot wound to her back, which pierced her lung and fractured some ribs. Dr. Thomas stated that this wound could possibly have been survived if the victim had received immediate medical attention. The victim had a less serious gunshot wounds on her upper chest, her upper left leg, and her upper right thigh. Dr. Thomas testified that all of the victim's wounds except the one on her right thigh had stipling, which would indicate the weapon was fired from three to six feet away. The wound on the victim's chest had the most stipling, indicating the weapon may have been closer when that wound was inflicted. Another wound in the victim's left leg shattered the femur. This wound would be consistent with the victim collapsing and being unable to stand. All of the shots had a downward trajectory. A bullet was recovered from the victim's right thigh. The parties stipulated that the bullet recovered from the victim was fired from a .38/.357 caliber firearm. The autopsy revealed that the victim had cocaine in her system. Dr. Thomas testified that the victim died of multiple gunshot wounds and that the manner of death was homicide.

Joshua Caldwell, who was incarcerated with the defendant, testified that the defendant had asked for his legal advice while they were housed together. The defendant

told Mr. Caldwell that a man named J.D.[2] was to testify against him and asked Mr. Caldwell if Mr. Caldwell thought that a homicide charge that J.D. had pending in Texas would affect J.D.'s credibility. The defendant then asked if Mr. Caldwell knew David Owens. He told Mr. Caldwell that his case started when he and Mr. Owens "got into it" earlier in the day and the defendant went looking for Mr. Owens. He told Mr. Caldwell that Mr. Owens's sister came out and "was talking sh*t" and that he "burnt the b*tch." The defendant then told Mr. Caldwell he wanted to make it seem as though the victim had been hit with shots fired from inside the house because the victim had been shot in the back and leg. The defendant also stated that J.D. had given him the gun used to accomplish the crime. Mr. Caldwell acknowledged prior felony convictions and stated that he had testified against his gang, the Aryan Nation, as well as against another inmate from Robertson County.

At the end of the proof, the defense moved for acquittal. The trial court granted the motion as it pertained to the reckless endangerment charge, noting that none of the testimony established that Mr. Williams was in danger of being harmed. The jury convicted the defendant of first degree murder, and he received a life sentence. The defendant appeals, alleging that the evidence is insufficient to show premeditation and that the prosecutor's opening statement warrants reversal.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant asserts that his conviction must be overturned because the evidence is not sufficient to support a finding of premeditation. He argues that the trial court erred in not granting his motion for judgment of acquittal.

In deciding a motion for judgment of acquittal, the trial court must determine the legal sufficiency of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). A distinction arises between a challenge to the sufficiency of the convicting evidence and a challenge to the trial court's denial of a motion to acquit only when the defendant introduces proof after the State rests its case. A motion for judgment of acquittal is waived if the defendant introduces proof after making the motion. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). When the defendant does not stand on a motion for judgment of acquittal, the appellate court may then consider evidence introduced after the

---

[2] There was testimony at trial that Mr. Pennington was sometimes called "J.P."

close of the State's case-in-chief in assessing the sufficiency of the evidence. *See Collier*, 411 S.W.3d at 893. The defendant may, of course, still challenge the sufficiency of all evidence introduced at trial. *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008). In this case, the defendant testified after the State rested its case, and on review, we consider all the proof introduced at trial in evaluating the sufficiency of the evidence supporting the verdict. Accordingly, the defendant's challenge is simply one to the sufficiency of the evidence.

When a court evaluates the sufficiency of the evidence, it must determine whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). This court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* The appellate court affords the prosecution the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant bears the burden of showing why the evidence is insufficient to support the jury's verdict. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010). Circumstantial evidence is sufficient to support a conviction, and "the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

In this case, the defendant was charged with first degree (premeditated) murder. The statute defines the offense as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d).

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id.* at 615. Courts frequently look to the circumstances surrounding a

9

killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

Considering the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the defendant acted intentionally and with premeditation. The evidence showed that the defendant was involved in a dispute with the victim and Mr. Owens centered around the defendant's ex-girlfriend. The defendant was aware that his ex-girlfriend was in a romantic relationship with Mr. Owens and had been spending time at Mr. Link's home. On the day of the shooting, the defendant had a chance encounter with Mr. Owens very close to Mr. Link's home. Mr. Owens immediately assaulted the defendant and began to run down a path that led to Mr. Link's home. The defendant then drove to Mr. Link's residence. Before he exited the vehicle, he put a gun in his pocket. No one else was armed, and the defendant testified he did not see anyone else with a weapon. The defendant told the victim and Mr. Williams, who were on the porch, that he was searching for Mr. Owens, and the victim answered him disrespectfully. Mr. Williams testified that the defendant told Mr. Pennington to get in the driver's seat and then pulled out the gun. Mr. Pennington, Mr. Williams, Ms. Harrison, and Mr. Holland all testified that there was a pause between the first one or two shots fired and the remaining gunfire. The witnesses who saw the shooting testified that the defendant shot the victim's leg or legs first. The victim suffered six gunshot wounds. The defendant then fled, and Mr. Pennington testified that the defendant had the weapon. The defendant's facial expression was "empty" or "dead." The defendant later told a fellow inmate that he killed the victim because she was "talking sh*t." The evidence, seen in the light most favorable to the prosecution, shows that the defendant had a grudge against the victim, that he prepared

for his confrontation with the victim by putting a gun in his pocket, that he used a deadly weapon on the unarmed victim, that he administered repeated blows, that he exhibited calmness after the killing, and that he hid the weapon. The evidence also shows opportunity for judgment and reflection when the defendant armed himself by putting the gun in his pocket and when he paused prior to administering the fatal shot. While the defendant presented evidence supporting a conclusion that he was "out of [his] mind" with rage after the assault, that he did not seek out the victim, that he believed Mr. Owens was in the home and might be armed, and that he did not realize the victim was in the line of fire, the jury was not required to credit this evidence. We conclude that the evidence was sufficient to support the verdict.

## II. Prosecutorial Misconduct

The defendant alleges that the prosecutor's reference to "this murder" in his opening remarks entitles the defendant to a new trial. Prior to trial, the defendant moved to redact the autopsy report to remove the word "homicide." The trial court noted that the report could properly conclude that the manner of death was homicide, but the court went on to state that whether or not the homicide amounted to "murder" was an issue for the jury. The court noted that it would not permit the prosecution to use the word "murder."

During his opening statement, the prosecutor stated that he anticipated testimony regarding:

> how this murder happened – excuse me, homicide. I
> shouldn't say murder. That is a mistake, that's my fault.
> How this homicide happened. It is yours to decide whether it
> is first degree or second degree. It's a homicide right now.
> We know that because the autopsy says that.

As both the defendant and State note, the defense did not object, and any review of the issue is for plain error.

For an error to constitute plain error sufficient to merit relief, the following factors must be present: a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is necessary to do substantial justice. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Additionally, "the plain error must be of such a

great magnitude that it probably changed the outcome" of the proceeding. *Bishop*, 431 S.W.3d at 44 (quoting *Adkisson,* 899 S.W.2d at 642). This court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).

The right to make an opening statement is protected by statute, which states that "all parties to the action shall have the right prior to the presentation of any evidence in the case to make an opening statement to the court and jury setting forth their respective contentions, views of the facts and theories of the lawsuit." T.C.A. § 20-9-301. Opening statements are not evidence but simply set forth the arguments and theories which will be relied on by the parties at trial. *State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993). They are "'are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.'" *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012), *as corrected* (Tenn. Oct. 10, 2012) (quoting *State v. Stout,* 46 S.W.3d 689, 713 (Tenn. 2001) (appendix) *superseded by statute as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004)). Opening argument, like closing argument, must be predicated on evidence introduced at trial and should only refer to admissible evidence. *Sexton*, 368 S.W.3d at 415. Opening statements may not be used "to present speculation and conjecture which is unsupported by admissible proof." *Stout*, 46 S.W.3d at 713.

While the trial court prohibited the prosecution from making any use of the word "murder" during opening statements, we note that the defendant was charged under a statute entitled "First degree murder" and that the prosecution could properly use the word "murder" in reference to the State's theory that the defendant was guilty under this statute. The mere use of the word "murder" in a prosecutor's opening statement at a trial where the defendant is charged under a statute entitled "First degree murder" is not in itself prohibited, so long as the prosecutor is setting forth the facts and theories which he or she believes will be supported by admissible evidence at trial. *See Sexton*, 368 S.W.3d at 415. The prosecutor's reference to a "murder" is improper if it is an expression of the prosecutor's personal belief in the evidence of the defendant's guilt. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (quoting Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971) (citations omitted); *see also State v. Thomas*, 158 S.W.3d 361, 414 (Tenn. 2005) (concluding that opening statements should not refer to the defendant through the use of epithets but that reference to defendants as "greed and evil" did not undermine fundamental fairness of the trial). Here, the prosecutor's statement was made in the context of arguing that the State would present proof establishing the elements of the crime. The use of the word "murder" should not be prohibited in such an instance. We note that the prosecutor's statement was nevertheless contrary to the trial court's order.

"Prosecutorial misconduct during argument does not constitute reversible error unless it appears that the outcome was affected to the defendant's prejudice." *State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005). In evaluating prejudice, the court considers (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *State v. Larkin*, 443 S.W.3d 751, 813 (Tenn. Crim. App. 2013).

We conclude that the use of the word "murder" by the prosecution during opening argument does not entitle the defendant to a new trial. The prosecutor's statement was apparently a reference to the charge against the defendant: "First degree murder." *See* T.C.A. § 39-13-202(a). As we have noted above, the prosecutor should not have been prohibited from using the word "murder" in this context. The prosecutor, aware of the trial court's order, attempted to undertake immediate curative measures, telling the jury, "That is a mistake, that's my fault." While these curative measures may have been incomplete in that the prosecutor, in correcting himself, only presented the jury with the options of "first degree or second degree," the defendant did not object or ask for further instructions. The defendant does not argue that the prosecutor had ill intent, and we perceive no other errors at trial. The case against the defendant was strong; he acknowledged having shot the unarmed victim. We conclude there was no prejudice. Neither does it appear that any error "probably changed the outcome" of the proceeding. *Bishop*, 431 S.W.3d at 44. We conclude that the defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

13